Richard N. SUNDERLAND, Administrator of the Estate of Sherman E. Sunderland, Deceased, Appellant,

v.

PITTSBURGH & LAKE ERIE RAILROAD COMPANY, Appellee.

No. 14072.

United States Court of Appeals. Third Circuit.

Argued Jan. 25, 1963.

Filed July 17, 1963.

Frank J. Kernan, Pittsburgh, Pa. (P. J. McArdle, Pittsburgh, Pa., on the brief), for appellant.

Gilbert J. Helwig, Pittsburgh, Pa. (Reed, Smith, Shaw & McClay, Pittsburgh, Pa., on the brief), for appellee.

Before STALEY and SMITH, Circuit Judges, and SHAW, District Judge.

WILLIAM F. SMITH, Circuit Judge.

This action for the alleged wrongful death of one Sherman E. Sunderland was brought by his personal representative under the Federal Employers' Liability Act, 45 U.S.C.A. § 51. The death of Sunderland resulted from injuries sustained when, during the course of his employment, he either fell or was thrown from the rear platform of a switch locomotive. The action was tried before the Court and a jury. At the conclusion of the plaintiff's evidence the Court granted the defendant's motion for dismissal of the action and entered judgment accordingly. This appeal followed. The question for decision is whether the evidence, viewed in the light most favorable to the plaintiff, was sufficient to require submission of the case to the jury.

The deceased was employed by the defendant as a yard foreman and, on the day of the accident hereinafter described, was engaged with his crew in assembling freight cars to make up a train. The crew consisted of the deceased, two brakemen, a fireman, and an engineer. The day was fair. At the time of the accident the operations of the crew centered around the lead track and the No. 4 track in the defendant's New Yard; these tracks ran from east to west. To switch from the lead to No. 4, required a slight turn to the north; thence No. 4 curved gradually in a southerly direction.

There were eleven loaded freight cars positioned on No. 4 track some distance eastwardly from the point at which No. 4 and the lead track joined. Near this latter point there was a draft of six loaded freight cars which protruded onto the lead. The crew undertook to move the six cars eastwardly into No. 4. There is a conflict in the testimony as to how far into No. 4 these cars were to be shoved. However, there is evidence from which it could be inferred that the object of the movement was merely to place the cars far enough into No. 4 to clear the lead. When the movement was undertaken, the coupling of the six cars was effected at the rear of the switch locomotive, the locomotive being operated in reverse. The locomotive proceeded in an easterly direction, shoving the six cars into No. 4.

While the operation was being carried out, each member of the crew was in his place on the locomotive. One of the brakemen, Thomas, stood on a step at the left front of the locomotive relative

to its reverse movement, looking in the direction of the movement. This member of the crew was responsible for pulling a cutting lever, thus releasing the coupling, when he determined that the six cars had been shoved a sufficient distance. This brakeman was also responsible for passing a hand signal to the operator of the locomotive when the uncoupling of the cars had been effected and the locomotive was to be brought to a stop. The brakeman, positioned as he was, was unable to see the eleven cars located eastwardly in No. 4.

At the time of the accident the locomotive was being operated by the fireman, Kerr, who held the position of "promoted engineer"; this position qualified him as an operator. The fireman occupied the engineer's place in the cab of the engine, which placed him on the left hand side rear relative to the reverse movement. He, too, was unable to see the eleven cars previously placed in No. 4. The fireman's attention was directed toward the brakeman, Thomas, from whom he was to receive the signal referred to above. The engineer occupied the place in the cab customarily occupied by the fireman, on the right side, rear of the locomotive.

The deceased stood on the rear platform, which placed him at the front of the locomotive relative to its reverse movement. Looking in the direction of the train movement, the deceased stood on the right hand portion of the platform. The second brakeman, Schofield, stood alongside of him on the left hand portion of the platform. Across the rear of the platform, and immediately in front of the deceased and Schofield, was a hand rail, some three to three and a half feet in height. While the movement of the six car draft was in progress, the deceased had no particular duties to perform other than the overall supervision of the operation.

There is testimony that the locomotive and six-car draft moved along track No. 4 until "there was an impact, a jar, as the six cars went against the eleven." There is also testimony, given by another witness, that the "jar" came after the six cars had been coupled to the eleven and as the train moved further into track No. 4. At or about the time the jar came, the engineer shouted "That will do," a common phrase used as a command to stop the locomotive. The fireman placed the automatic brake valve in emergency position and brought the locomotive to a "quick stop," described also as "quicker than a normal stop." The witnesses testified that they saw the body of the deceased "in the air." One of them testified "it was just going over the back hand rail in a flat position," described as "parallel with the ground * * *."

There is some conflict in the testimony with respect to the time sequence of the "jar" or "impact," the emergency application of the brakes, and the witnesses' view of the deceased "in the air" going over the hand rail. The engineer was not called to testify; therefore, it is not known what prompted his shouting of the signal to stop the locomotive. Nor is it clear what caused the "jar" or "impact."

The trial judge concluded, on the basis of the testimony herein summarized, that the plaintiff had failed to present evidence from which a jury could with reason conclude that "employer negligence played any part, even the slightest, in producing the death for which damages" were sought. We are of the opinion that this was error and that the issues of negligence and causation should have been submitted to the jury.

■■ The test of a jury case under the Act, and the limits of judicial inquiry, are defined in Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), as follows: "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the

result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities." We are of the opinion that the evidence, as a whole, viewed in the light of these principles, was sufficient to require submission of the case to the jury.

 There was testimony that there occurred, without warning, a "jar" or "impact" and, almost simultaneously therewith, an emergency application of brakes that brought the locomotive to a "quick stop." Each of the witnesses testified that the deceased was propelled over a hand rail from three to three and a half feet in height at or about the time of these occurrences. There must be added to this evidence the presumption that the deceased, while in the performance of his duties, was exercising due care for his own safety. See Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 34, 64 S.Ct. 409, 88 L.Ed. 520 (1944). From the evidence as a whole, and in light of the presumption, the jury could have found either that the impact was more than "slight," and therefore unexpected, or that the sudden application of the brakes was prompted by some reason other than the deceased's fall, and was, in fact, the cause of it. "The choice of conflicting versions of the way the accident happened, the decision as to which witness was telling the truth, the inferences to be drawn from uncontroverted as well as controverted facts, are questions for the jury." Ellis v. Union Pacific R. Co., 329 U.S. 649, 653, 67 S.Ct. 598, 600, 91 L.Ed. 572 (1947). See Tennant v. Peoria & P. U. Ry. Co., supra. The jury could have reached a conclusion contrary to that reached by the trial judge.

The defendant relies heavily on Moore v. Chesapeake & O. R. Co., 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547 (1951), which was decided on its own peculiar facts and is distinguishable from the present case. Therein the engineer testified that he made an emergency stop after he had seen the deceased tumble forward in a somersault toward the outside track. This testimony of the engineer was not contradicted. The testimony in this case is susceptible of a permissible inference that an emergency application of the brakes was made before the deceased was seen falling over the rail. We have considered the other cases cited by the defendant and find that they are distinguishable on their facts and are therefore not applicable.

The judgment of the court below will be reversed and the action will be remanded with directions that a new trial be ordered.